## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| WENDY PYFRIN FEUCHT, Individually and | : | |
| as the Co-Administrator of the Estate of | : | |
| BETHANY THOMPSON, *et al.*, | : | Case No. 3:18-cv-345 |
| | : | |
| Plaintiffs, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| TRIAD LOCAL SCHOOLS BOARD OF | : | |
| EDUCATION, *et al.*, | : | |
| | : | |
| Defendants. | | |

_____

### ENTRY AND ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT (DOC. 17), AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING CLAIMS AND THEREFORE DISMISSING THE REMAINING CLAIMS WITHOUT PREJUDICE TO REFILING IN STATE COURT

_____

Pending before the Court is the Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 17) (the "Motion"), filed by Defendants Triad Local Schools Board of Education (the "Board"), Duane Caudill ("Caudill"), Christopher Piper ("Piper"), and Jessica Gronas ("Gronas") (collectively, the "Defendants"), pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs Wendy Pyfrin Feucht and Paul Thompson (collectively, "Plaintiffs")[1] filed a Memorandum in Opposition to the Motion. (Doc. 25.) Defendants filed a Reply in support of the Motion. (Doc. 27.) The Motion is fully briefed and ripe for review.[2] (Docs. 17, 25, 27.)

For the reasons discussed below, the Court **GRANTS** the Motion with respect to the federal

---

[1] Ms. Feucht sues "individually and as the co-administrator of the Estate of Bethany Thompson and as Next Friend of E.F., a minor." (Doc. 14.) Mr. Thompson sues "individually and as the co-administrator of the Estate of Bethany Thompson." (*Id.*)

[2] Plaintiffs requested oral argument on the Motion, pursuant to Local Rule 7.1(b)(2), "because of the number and relative complexity of the issues presented." (Doc. 25 at PAGEID # 413.) However, the Court denies the request.

law claims alleged in the Amended Complaint (i.e., Counts 1, 2, and 3). Those claims are dismissed. The Court also dismisses certain claims, as set forth below, that Plaintiffs conceded should be dismissed. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law and relief claims. Those claims are dismissed without prejudice to refiling in state court. In essence, the Court merely finds that the Amended Complaint does not state a facially plausible claim for relief under federal law.

## I.     **BACKGROUND**

This case involves the tragic death of 11-year old Bethany Thompson ("Bethany"), who took her own life on October 19, 2016. To say that the circumstances alleged are disheartening is a considerable understatement. The remainder of this Background section consists of allegations taken from Plaintiffs' First Amended Complaint (the "Complaint") (Doc. 14); none of the allegations have been proven given that the case is still in the pleadings stage.

Plaintiffs, Wendy Pyfrin Feucht ("Wendy") and Paul Thompson ("Paul"), are Bethany's mother and father and the co-administrators of her estate. At all relevant times, Piper served as the Superintendent of Trial Local School District, Caudill served as the Principal at Triad Middle School, and Gronas served as the Guidance Counselor at Triad Middle School. Bethany and her parents tried to stop the bullying Bethany faced at school and repeatedly pleaded with certain defendants for help. Defendants failed to stop the bullying, and it continued. Consequently, Bethany suffered severe anguish, distress, and depression, and she ultimately committed suicide. On October 19, 2016, after years of pervasive bullying, harassment, assault and discrimination as a student in the Trial Local School District, Bethany, aged 11 and a sixth grader at Triad Middle School, killed herself with a gunshot to her head.

From a very early age, Bethany suffered from a visible, permanent deformity on the right

side of her face. For many years, and particularly as a student at Triad Middle School, Bethany endured harassment and bullying at school at the hands of numerous students, some of whom are yet to be identified. It took the form of name-calling, verbal and physical harassment, sexual harassment, and physical pushing, shoving and elbowing in the school halls, during class, at recess, and on the bus.

Other Triad students also suffered unrelenting bullying and discrimination. In 2012, another Triad Middle School student committed suicide, although it is unknown whether bullying was a precipitating cause of that child's death. The 2012 suicide should have put the school district on high alert as to the psychological and emotional needs of its students and should have prompted the school to adopt a zero-tolerance policy regarding aggressive and harassing behavior.

On December 11, 2014 (about two years before her death), Bethany wrote a letter to another student at recess stating that she was going to kill herself. Bethany's teacher reported the incident, per school rules, and also informed Bethany's mother. As a result of the suicidal statement, Bethany began receiving counseling at school. The Defendants knew or should have known of Bethany's 2014 suicidal threat.

On numerous occasions during the 2015-2016 school year and other years, Wendy informed the Defendants, including Principal Caudill and other school district employees, that Bethany was being harassed, bullied, and discriminated against. Each time the Defendants assured Wendy that they were aware of the issues and the situation was being handled. On March 21, 2016, in an email, Bethany told Witness No. 1 that Minor No. 1 had shoved her when exiting the art room and that the next time she saw him (Minor No. 1) she elbowed him and told him that she had enough. That same day, Minor No. 1 snuck up on Bethany on the way to the bus and elbowed her. Witness No. 1 emailed Bethany the next day: "I feel so bad because you put up with him,

3

too. Minor No. 1 is mean to everybody, I mean he talks about everybody and he shoved me the other day … I don't know what he will do next either."

During the 2016-2017 school year, Bethany and Witness No. 1 were again subjected to severe and pervasive bullying, verbal harassment, and discrimination by Minors No. 1-5, including threats that they would tie the girls up and rape them. Such threats and harassment were specifically premised upon Bethany and Witness No. 1's gender. Minors No. 1-5 discriminated against, harassed, and bullied Bethany in part because she was female and had a disability. Upon information and belief, no more than a cursory investigation was conducted by the Defendants and little to no disciplinary action was ever imposed on the perpetrators of the bullying. Additionally, the Defendants knowingly placed Bethany in the same class with Minor No. 1, who was the ringleader of the group of boys that incessantly bullied Bethany.

On September 8, 2016 (about a month-and-a-half before her suicide), Bethany informed Principal Caudill that she was being harassed by Minor No. 1, telling him that Minor No. 1 is calling her names and intentionally trying to annoy her both in the classrooms and the hallways. The next day, Bethany's mother (Wendy), called Principal Caudill to inform him that Minor No. 1 was harassing Bethany "again this year." During that conversation, Principal Caudill blamed Bethany for "instigating Minor No. 1," but promised action and to keep Bethany safe. Plaintiffs relied upon the misrepresentations made by Defendants that the bullying was being addressed and that Bethany was safe. However, the Defendants failed to address the bullying, harassment, and discrimination.

The next day, Wendy sent multiple teachers an email regarding the issues that Bethany was having with Minor No. 1 at school:

"I spoke to Mr. Caudill on Friday about Bethany having issues with Minor No. 1 again this year. Mr. Caudill mentioned something about Bethany instigating Minor

4

No. 1. … My child is not perfect, no child is. I understand that. Obviously, I don't get to see what you all get to see. All I see is my daughter bawling in her room because she is so worried about Minor No. 1 and what he will say at school, if it will get worse, or even physical like it did last year. There's only so much I can do for her here at home as her mother, with guidance, words of encouragement, and promises that authority figures in her school will look out for her. If she is part of the problem, by all means PLEASE let me know and we can have a meeting on what needs to be done. I have instructed her, as Mr. Caudill and I agreed, to completely ignore Minor No. 1. Not to speak or interact with him under any circumstance. That way she can in no way be held responsible for instigating or being part of the problem. I am asking for your help. Minor No. 1 nitpicking is becoming a 'bullying issue' with Bethany. She's upset during, after, and before school because of him. His actions/words are interfering with her weekends, her happiness, her worries ... her security. She's eleven [and] full of hormones, I get that. However, this is becoming something that is affecting her and turning the other cheek and ignoring the problem isn't resolving anything. I am requesting that she is not put anywhere near him in classes they share together and also that she's not partnered with him for any reason. …."

On September 12, 2016, a teacher responded to Wendy's email and indicated that she and others would continue to monitor the situation.

On or about September 14, 2016 (a little over a month before her suicide), Bethany began expressing suicidal thoughts to Witness No. 1 and Witness No. 3 and expressed that she thought that the bullying and harassment would never end. She told Witness No. 1 that if the school would not do something about the bullying then she would "handle the situation with a gun." That same day, Witness No. 1 informed her father, Witness No. 2, that Bethany was making suicidal threats and that Bethany said that she was "done with the bullies" and "wanted to kill herself with the gun from the closet." Upon learning this, Witness No. 2 called Principal Caudill and informed him that Bethany was threatening to kill herself and that both his daughter and Bethany were continually bullied at school. Principal Caudill assured Witness No. 2 that he would contact Bethany's mother right away, that he was aware of the bullying, and that he was "monitoring" the situation. Witness No. 2 relied upon the misrepresentations made by Caudill, and, as a result, did not take action on his own to contact Bethany's parents and did not take action on his own to

5

prevent further bullying or Bethany's threatened suicide.

On September 15, 2016 (the next day), Principal Caudill informed Guidance Counselor Gronas of Bethany's suicidal threat. That same day, Gronas emailed Caudill: "Bethany said she is not considering harm to herself and that she never told anyone that she was. We talked about focusing on the good in each day and not thinking how people treated her in the past, but every day is a fresh start." Caudill responded: "Thank you!" However, Caudill and Gronas failed to contact Bethany's parents to inform them of Bethany's suicidal threats or the bullying; failed to secure a psychological evaluation; failed to refer Bethany for counseling; and, failed to take any effective action whatsoever in regard to the information that Bethany was suicidal. In failing to do so, Principal Caudill and Guidance Counselor Gronas failed to follow the School District's bylaws and handbook as it pertained to the actions to be taken by school employees upon learning that a student was suicidal and/or being bullied.

Defendants [allegedly] violated their own bylaws and policies. In regard to suicidal threats, Section 5350 of the Triad Local School District Bylaws and Policies requires school personnel to take suicidal threats or tendencies with the "utmost seriousness and should be reported immediately to the building administrator" and the building administrator (Principal Caudill) "should immediately notify the parents or appropriate social agencies of the child's suicide attempt or tendencies toward such action." Principal Caudill and Guidance Counselor Gronas ignored the School District Bylaws and Policies, Principal Caudill failed to address the information provided to him by Witness No. 2, and Principal Caudill failed to inform Bethany's parents or anyone else of the suicidal threats and bullying. Defendants' Student Code of Conduct states that "the Board has a 'zero tolerance' of violent, disruptive or inappropriate behavior by its students." Defendants' Sexual Harassment Policy prohibits sexual harassment and defines sexual harassment as:

unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct, and other verbal or physical conduct or communication of a sexual nature.

On September 22, 2016 (four weeks before her suicide), Bethany was forced to sit at a science table with Minor No. 1 because it was the last seat available. Per the teacher's instructions to ask other students questions before asking the teacher a question, Bethany asked Minor No. 1 a question. Bethany was disciplined for doing so because they had been told not to speak with one another. Four days later, Wendy contacted Principal Caudill to inquire about this incident. At no time during that initial contact and three subsequent emails between Wendy and Principal Caudill did Caudill inform Wendy that her daughter had threatened suicide less than ten days earlier.

Wendy contacted Principal Caudill again approximately one week prior to Bethany's death to discuss bullying concerns. Caudill failed to inform Wendy that he had information that Bethany was suicidal. During this conversation, Caudill again informed Wendy that the bullying situation was "being handled." Plaintiffs relied on the many misrepresentations made by Defendants that the bullying was being addressed and did not take any action on their own to prevent the bullying.

On the date of her death, October 19, 2016, Bethany sought out Guidance Counselor Gronas for a discussion. Plaintiffs believe that those discussions addressed bullying in some way. Bethany later informed witnesses that Gronas denied Bethany permission to hang up anti-bullying posters at the school. Prior to leaving school, Bethany posted signs on the lockers of several other students that said "good luck." Bethany informed Witness No. 1, Witness No. 3, and Witness No. 4 that she was suicidal. Witness No. 1 informed her father, Witness No. 2, after school that Bethany had stated that she was going to "go home and kill herself." Witness No. 2 immediately set about trying to contact Bethany's mother, but by the time he reached Wendy, Bethany had already carried out her threat and killed herself.

In addition to Bethany, other Triad students were also bullied, harassed, and discriminated against, with the actual knowledge of the Defendants, and the Defendants failed to appropriately respond to end those practices and protect the victims.  Plaintiffs' action seeks damages and to reform the Triad Local Schools' policies and practices for responding to bullying, harassment, assault, battery, and discrimination.

## II.  <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this Rule "does not require 'detailed factual allegations' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  A claim is facially plausible when it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard is not the same as a probability standard, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).  Thus, if a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When ruling on a motion to dismiss, the Court must accept the factual allegations of the complaint as true and construe them in a light most favorable to the non-moving party. *Twombly*,

550 U.S. at 554-55. However, the Court is not bound to accept as true a legal conclusion couched as a factual allegation. *Id*. at 555-56. "In evaluating a motion to dismiss [a court] may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) (internal quotation marks omitted).

### III. <u>ANALYSIS</u>

#### A. <u>Plaintiffs' Concession to Dismissing Certain Claims</u>

Plaintiffs do not oppose dismissal of Count 4 (Violation of the Americans With Disability Act) and Count 10 (Negligent Infliction of Emotional Distress). (*See* Doc. 25 at PAGEID # 402, 407-08.) Therefore, Counts IV and X of the Complaint are dismissed.

Additionally, Plaintiffs concede that the Decedent's parents—<u>on their own behalf</u>—do not have a cause of action for violation of Title IX for sex discrimination and clarify that Count 2 is brought on Decedent's behalf. (*Id*. at PAGEID # 402.) Therefore, any claim by Plaintiffs on their own behalf for violation of Title IX in Count II of the Complaint is dismissed.

Plaintiffs also concede that their state law claims against the Board—with the exception of Count 11 (Violation of R.C. § 2151.421 Failure to Report Child Abuse)—cannot be asserted against the Board due to governmental immunity. (*Id*. at PAGEID # 409.) Therefore, Counts V, VI, VII, VIII, IX, and XIII of the Complaint <u>against the Board (only)</u> are dismissed.

#### B. <u>Federal Claims (Counts 1, 2, and 3)</u>

The Complaint therefore includes three claims under federal law against one or more of the Defendants: Count 1 (Violation of U.S. Constitution Amendment XIV Substantive Due Process); Count 2 (Violation of Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 Sex Discrimination) (against the Board only); and Count 3 (Unlawful Policy, Practice, or Custom in

Failing to Respond to Bullying, Harassment, Sexual Discrimination, Disability Discrimination and Assault/Battery).

### (1) Count 1 – violation of substantive due process

42 U.S.C. § 1983 ("Section 1983") "provides a cause of action for deprivation, under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994).[3] "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (*citing West v. Atkins*, 487 U.S. 42, 48 (1988)).

Plaintiffs argue that Defendants deprived two rights secured by the Substantive Due Process Clause of the Fourteenth Amendment:  (1) Bethany's parents' liberty interest in their familial association with their child; and (2) Bethany's right to life.  (Doc. 14 at PAGEID # 276-77; Doc. 25 at PAGEID # 393.)  The Fourteenth Amendment's Due Process Clause provides that no State shall deprive any person of life, liberty, or property, without due process of law.  U.S. CONST. amend. XIV, § 1.

The Court first briefly addresses the substantive due process claim for deprivation of Bethany's parents' familial association with their child.  Such a claim is not recognized in the Sixth Circuit.  *See Foos v. City of Delaware*, 492 F. App'x 582, 592-93 (6th Cir. 2012); *Winston v. City of Cleveland*, No. 1:14 CV 2670, 2016 U.S. Dist. LEXIS 12248, at *17-18 (N.D. Ohio Feb. 2,

---

[3]  Section 1983 states:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. … "

2016) (although the plaintiffs argued that there is a circuit split on whether a parent can bring a Section 1983 claim for deprivation of familial association, they "concede that the Sixth Circuit declined to recognized this right" and "[t]he parties agree that the Sixth Circuit has declined to allow this type of section 1983 claim by family members at this time, and the court is bound by this precedent") (citing *Foos*, among other cases).  Despite Plaintiffs' citation to *Kottmyer v. Maas*, 436 F.3d 684 (6th Cir. 2006) in support of this claim, a subsequent Sixth Circuit decision explained that the discussion in *Kottmyer* regarding "familial association" was dicta.  *Brooks v. Knapp*, 221 F. App'x 402, 407 (6th Cir. 2007).  Moreover, even if it was not dicta, *Kottmyer* said that "courts have recognized that the right to familial association is implicated by the killing of a child by a state agent"; however, this case does not implicate the killing of a child <u>by a state agent</u>.  *Kottmyer*, 436 F.3d at 690; *Brooks*, 221 F. App'x at 407-08 ("the present claim for familial association fails in any event because Mr. Hernandez, not the officer defendants, killed the victim").[4]

The Court now turns to the claim concerning Bethany's right to life.  "It goes without saying that an individual's interest in preserving her life is one of constitutional dimension." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (internal quotation marks omitted).  "Therefore, the first § 1983 element – deprivation of a right secured by the Constitution or laws of the United States – is clearly satisfied."  *Id.*

The crux of the issue here is the second element required for a Section 1983 claim: whether the deprivation of the Constitutional right was <u>caused by</u> a person acting under color of state law. The Sixth Circuit has explained that "[t]he purpose of the Due Process Clause is 'to protect the people from the State, not to ensure that the State protect[s] them from each other.'"  *Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 853 (6th Cir. 2016) (*quoting DeShaney v. Winnebago Cnty.*

---

[4] This Court echoes what the Sixth Circuit stated in *Foos*:  "While we understand the unspeakable pain that [Bethany's] parents endured, § 1983 does not provide them with a remedy."  *Foos*, 492 F. App'x at 593.

*Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). The Supreme Court in *DeShaney* explained:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney*, 489 U.S. at 195. "For this reason, the Supreme Court held in *DeShaney* that the Due Process Clause does not create an affirmative right to governmental aid." *Stiles*, 819 F.3d at 853.

Plaintiffs concede that *DeShaney* establishes a rule that, "[g]enerally, 'a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause.'" (Doc. 25 at PAGEID # 393, *quoting DeShaney*, 489 U.S. at 197.) This is the case "even in the face of undeniably tragic and calamitous circumstances." *McQueen*, 433 F.3d at 464 (internal quotation marks omitted). However, there are exceptions to this general rule "in certain limited circumstances." *Id*. Thus, the issue of whether the Complaint adequately pleads a substantive due process claim requires that one of the exceptions to that general rule in *DeShaney* applies. *Stiles*, 819 F.3d at 853 ("[b]ecause [the bullying victim] was harmed by students rather than school or government officials, there is no constitutional violation unless one of" the exceptions to the *DeShaney* rule applies).

Plaintiffs argue that at least one of three alleged exceptions to the general rule in *DeShaney* apply: (1) the "special relationship" exception, (2) the "shocks the conscience exception," or (3) the "state-created danger" exception.[5] (Doc. 25 at PAGEID # 393-94.)

---

[5] As addressed below, Defendants argue that there is no "shocks the conscience exception" to the general rule set forth in *DeShaney*, but instead that a necessary element of a substantive due process claim is that the defendant's actions "shock the conscience." (Doc. 27 at PAGEID # 433-34.)

### a)  "Special Relationship" Exception

Although Plaintiffs reference that they are making a "special relationship" claim (Doc. 25 at PAGEID # 393-94), they fail to support that argument in their briefing.  This is unsurprising given that Sixth Circuit law demonstrates that such a claim would not apply in this context. *McQueen*, 433 F.3d at 464 n.4 (6th Cir. 2006) ("there is no 'special relationship' between a school and its students that gives rise to a constitutional duty"); *Stiles*, 819 F.3d at 854 ("the Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability").  The Court finds that the Complaint fails to adequately plead that the "special relationship" exception applies.

### b)  "Shocks the Conscience"

Although Plaintiffs argue that there is a "shocks the conscious" exception to *DeShaney*'s rule that a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Claim, Plaintiffs are mistaken.  *Stiles*, 819 F.3d at 853 ("Two exceptions to this rule exist," the special relationship exception and the state-created danger exception).  Instead, in this particular context, courts consider whether the alleged state action "shocks the conscience" within the third element—the culpability element—of the "state-created danger" exception, addressed below.  *See McQueen*, 433 F.3d at 469.

### c)  "State-Created Danger" Exception

The Sixth Circuit has established that, to prevail on a state-created danger theory, Plaintiffs must establish three elements:

(1) an affirmative act that creates or increases the risk to the plaintiff;

(2) a special danger to the plaintiff as distinguished from the public at large; and

(3) the requisite degree of state culpability.

13

*Stiles*, 819 F.3d at 854. The state-created danger exception has been described as being a "demanding standard for constitutional liability" with only a "narrow path for recovery." *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006); *Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019). The Sixth Circuit also recently called the exception "an anomaly" because it "allows plaintiffs to bring due process claims under § 1983 for harms caused by private actors," yet "neither the Fourteenth Amendment nor § 1983 regulates private actors." *Estate of Romain*, 935 F.3d at 491.[6] Additionally, the Sixth Circuit has recognized that there are particular difficulties in establishing a claim in cases of suicide. *See Cutlip v. City of Toledo*, 488 F. App'x 107 (6th Cir. 2012); *Jahn v. Farnsworth*, 617 F. App'x 453 (6th Cir. 2015) (concluding that the state-created danger exception was inapplicable because decedent committed suicide off of school grounds after being released into his parents' custody).[7]

i.   Affirmative acts that create or increase the risk

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen*, 433 F.3d at 464. The Sixth Circuit has "set a high bar" for the affirmative act requirement. *Id.* at 468. "[F]ailure to act is not an affirmative act under the state-created danger theory." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). In the bullying context, the Sixth Circuit has specifically held that "[f]ailing to punish students, failing to enforce

---

[6] *See also Jahn*, 617 F. App'x at 458 ("The Supreme Court has significantly limited the scope of rights covered by the substantive portion of the Due Process Clause and remains reluctant to expand this relatively limited category of rights that are considered substantive due process rights"); *Cutlip*, 488 F. App'x at 116-117 ("the Supreme Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended") (internal quotation marks omitted).

[7] The Sixth Circuit in *Cutlip* stated: "[t]he rarity of *DeShaney* liability for suicides can be partially attributed to the high standard of proof in state-created-danger cases, but it is also uniquely difficult to assign constitutional liability to the government when the non-custodial victim harms himself. As a general principle, people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him. That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction." *Cutlip*, 488 F. App'x at 116.

14

the law, failing to enforce school policy, and failing to refer assaults [to a law enforcement officer] are plainly omissions rather than affirmative acts." *Stiles*, 819 F.3d at 855.

In light of *Stiles*, Plaintiffs concede that "failing to act in the school bullying context does not satisfy the element of an affirmative act." (Doc. 25 at PAGEID # 394.) Therefore, the majority of the allegations in the Complaint cannot establish a substantive due process violation because they are clearly failures to act by Defendants. Yet, Plaintiffs argue that three alleged acts would qualify, asserting that they do "not merely allege that Defendants failed to adequately communicate with Bethany's parents about the ongoing bullying or Bethany's suicidal ideations, but instead that Defendants: (1) affirmatively misrepresented to Bethany's mother than they were handling the bullying; (2) affirmatively misrepresented to Witness No. 2 that they would report to Bethany's mother her suicide threats; (3) and required Bethany to be in close proximity to Minor No. 1 by assigning her to the same classes, and in at least one instance, to the same science table." (Doc. 25 at PAGEID # 394 (emphasis in original).)

The third item is an "affirmative act," not a failure to act. However, whether the first and second items are also "affirmative acts" is a much closer call. *Jones*, 438 F.3d at 692 ("[w]hether the conduct of government officials in some cases should be treated as a failure to act or as action may be a difficult question in the abstract"). Those two items constitute false assurances. One could argue that they are equivalent to failures to act because they merely consist of assuring someone that they will do an act, but then failing to do the act. However, with respect to these two items, the Court will assume—without deciding—that they too are acts and not failures to act because, as shown below, the Court does not need to determine whether they constitute an "affirmative act" under the state-created danger exception.[8]

---

[8] As also explained below regarding qualified immunity, neither party has cited to caselaw—and the Court has found none—that clearly establishes that the Sixth Circuit has held that a misrepresentation or false statement

Even if there is an "affirmative act," that act must "either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen*, 433 F.3d at 464. As the Sixth Circuit in *Stiles* explained, "[t]he ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it." *Stiles*, 819 F.3d at 854. In demonstrating the narrow scope of this element, it noted that "[e]ven affirmatively returning a victim to a preexisting situation of danger does not create or increase the victim's risk of harm." *Id*. at 855. The Court will again assume—without deciding—that this portion of the first element of the state-created danger exception is also met for all three items referenced above.

ii.   Special danger

"In addition to an affirmative act, plaintiffs alleging a constitutional tort under § 1983 must show a 'special danger.'" *McQueen*, 433 F.3d at 467-68 (internal quotation marks omitted). "[A] special danger exists where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Id*. at 468. The Sixth Circuit "set a high bar for the special danger requirement." *Id*. at 468-69 (finding issue of fact concerning existence of a special danger where five children were left alone in a room with an armed classmate). Taking the factual allegations in the Complaint as true and viewing them in the light most favorable to Plaintiffs, the Court finds that the Complaint adequately pleads the special danger element with respect to the three items that Plaintiffs argue are affirmative acts.

---

(particularly falsely assuring that one will take action and then failing to act) is an "affirmative act" under the state-created danger theory. In fact, the main case relied on by Plaintiffs says: "the Sixth Circuit has not specifically ruled on whether affirmative misrepresentations and concealment are affirmative acts." *Myers v. Cincinnati Bd. Of Educ.*, 343 F. Supp. 3d 714, 723 (S.D. Ohio 2018). Of course, caselaw and policy arguments can be used to support an argument either way, as the parties do here in their briefing. However, again, the Court does not need to, and declines to, make such a determination. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case") (internal quotation marks omitted).

iii.     State culpability

"The due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). A plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *McQueen*, 433 F.3d at 469. The Sixth Circuit in *Ewolski* explained the culpability requirement:

> In order to establish a constitutional violation … it is not enough to show a causal connection between state action and an act of private violation. … [the plaintiff] must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment. As the Supreme Court has explained, this requires that the § 1983 plaintiff show that the challenged action was so egregious that it can be said to be arbitrary in the constitutional sense. The Supreme Court in elaborating upon this standard, has repeatedly instructed that the Fourteenth Amendment protects only against abuse of executive power which 'shocks the conscience.'

*Ewolski*, 287 F.3d at 510 (internal quotation marks and citations omitted).

The Sixth Circuit later clarified that "the 'shocks the conscience' standard … is … a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014) (internal quotation marks omitted). "Merely negligent tortious conduct" does not rise "to the 'conscience-shocking' level," conduct that is intended to injure without any justifiable government interest does rise to that level, and "[c]onduct that is more akin to recklessness or gross recklessness, such as deliberate indifference," are states of culpability that may or may not be shocking depending on the context." *Id.* "[A] deliberate-indifference standard is appropriate in settings that provide the opportunity for reflection and unhurried judgments, but a higher bar may be necessary when opportunities for reasoned deliberation are not present." *McQueen*, 433 F.3d at 469.

Deliberate indifference is equated "with subjective recklessness, which means that the official must both be aware of facts from which the inference could be drawn that a substantial

risk of harm exists, and he must also draw the inference." *McQueen*, 433 F.3d at 469 (internal quotation marks omitted). "[T]he type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent." *Range*, 763 F.3d at 591. Yet, "where a plaintiff claims that a non-custodial substantive due process violation has occurred because of the government's deliberate indifference, something more must be shown—a something that [the Sixth Circuit has] variously described as callous disregard for the risk of injury, or action in an arbitrary manner that shocks the conscience or that indicates an intent to injure." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005).

Whether the alleged false assurances (items one and two referenced above) meet the state culpability requirement is, once again, a close call that the Court will assume—again, <u>without deciding</u>—is met. However, the third item (that the Defendants required Bethany to be in close proximity to Minor No. 1 by assigning her to the same classes, and in at least one instance, to the same science table four weeks before her suicide) does not meet the culpability requirement, even when considered with the other alleged conduct and construed in the most-favorable light. *Schroder*, 412 F.3d at 730 (the culpability requirement "ensures that only the most egregious official conduct can be said to be arbitrary in the constitutional sense"). Although the Court finds that the deliberate-indifference standard is the one to be applied to the government conduct at issue because a hurried judgment was not required, the factual allegations come woefully short of what is necessary to allege the requisite degree of state culpability with respect to item three. *Ewolski*, 287 F.3d at 510; *Schroder*, 412 F.3d at 730. Additionally, any connection between, on the one hand, requiring Bethany to be in close proximity to Minor No. 1 and (four weeks before her suicide) requiring her to sit at the same science table with him, and on the other hand, depriving

18

Bethany of her right to life, is remote.  *Range*, 763 F.3d at 591; *McQueen*, 433 F.3d at 469 (although the defendant teacher was aware of student's disruptive and sometimes violent behavior, no reasonable fact finder could conclude that the teacher knew the student would use a gun to kill another student if left unsupervised for a few minutes); *DeShaney*, 489 U.S. at 195 (the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means").

### d)  Qualified Immunity

The Motion argues that the individual Defendants are entitled to qualified immunity on Plaintiffs' Section 1983 claims against them in their individual capacity.[9]  (Doc. 17 at PAGEID # 317-20.)   Qualified immunity generally shields government officials who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and it protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To avoid the shield of qualified immunity, a plaintiff must properly plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).  "A Government official's conduct violates clearly established

---

[9] The Court notes that Plaintiffs' claims against the Individual Defendants in their official capacities are deemed to be claims against the municipality.  *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents").

law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. at 741. Although courts "do not require a case directly on point … existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. A court has the discretion to decide which of those two prongs of the qualified immunity analysis to tackle first. *Id*. Also, "it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Stoudemire v. Mich. Dep't. of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013).

Here, the individual Defendants are entitled to qualified immunity on Plaintiffs' Section 1983 claims. As shown above, except potentially with respect to the alleged false assurances, the Complaint does not plead facts to satisfy the first element: "that the official violated a statutory or constitutional right." *al-Kidd*, 563 U.S. at 735. And, the alleged false assurances do not meet the second element. Neither party has cited to caselaw—and the Court has found none—that clearly establishes that false assurances (particularly falsely assuring that one will take action and then failing to act) are considered affirmative acts under the state-created danger theory. In fact, the main case relied on by Plaintiffs (*Myers*, recently decided on September 24, 2018) states: "the Sixth Circuit has not specifically ruled on whether affirmative misrepresentations and concealment are affirmative acts." *Myers*, 343 F. Supp. 3d at 723. Not only was *Myers* issued well after the events at issue in the Complaint, the alleged acts in that case are significantly distinguishable from the alleged false assurances alleged here. In *Myers*, the government officials allegedly lied about a fact (telling the decedent student's mother that he had fainted even though they knew that he actually had been knocked unconscious for several minutes due to an attack by bullies in a bathroom two days before his suicide) and allegedly took actions to conceal the attack.

Plaintiffs rely on *Shively* to argue that qualified immunity does not apply. However, (1)

20

*Shively* did not address whether misrepresentations are affirmative acts (instead, it dealt with failures to act), and (2) subsequent to *Shively* the Sixth Circuit decided *Stiles*, which held that failures to act are not "affirmative acts" for purposes of the state-created danger exception. *Shively*, 579 F. App'x at 353, 356; *Stiles*, 819 F. 3d at 854-55. The Sixth Circuit decided *Stiles* more than six months before Bethany's suicide.[10] *Stiles*, 819 F.3d 834 (decided March 25, 2016). Therefore, the Court finds that the individual Defendants' alleged conduct (the false assurances) did not violate "clearly established law" because, at the time of the challenged conduct (at least), the contours of the right with respect to that alleged conduct were not sufficiently clear such that "every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741.

### (2) Count 2 – violation of Title IX for sex discrimination

Count 2 of the Complaint alleges that the Board violated Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 ("Title IX") by violating Bethany's right to be free from discrimination on the basis of sex in federally-funded education programs and activities. (Doc. 14 at PAGEID # 279-80.)

"Title IX provides, with certain exceptions not at issue here, that 'no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages

---

[10] Plaintiffs also rely on *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, No. 1:15cv787, 341 F. Supp. 3d 793, 803 (S.D. Ohio 2018), but that case was issued well after the events at issue in this case. Plus, *Estate of Olsen* relies on portions of *Shively* that are arguably in conflict with the Sixth Circuit's subsequent decision in *Stiles*. The Court agrees with the Defendants that any finding in *Shively* that the state actors' "decision not to enforce rules against bullying or punishments for bullying" were affirmative acts under the state-created danger exception conflicts with the Sixth Circuit's holding in *Stiles*. *Shively*, 579 F. App'x at 356.

are available." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018); *see also Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 258 (6th Cir. 2000). "[S]exual harassment is a form of discrimination for Title IX purposes." *Davis*, 526 U.S. at 649-50.

In *Davis*, "the Supreme Court held that 'in certain limited circumstances,' peer-to-peer sexual harassment supports a Title IX civil damages claim against a funding recipient." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012) (*quoting Davis*, 526 U.S. at 643). "*Davis* limits liability 'to cases having a systemic effect on education programs or activities.'" *Id.* (*quoting Davis*, 526 U.S. at 653). "The *Davis* opinion established three *prima facie* elements for a Title IX claim based on student-to-student harassment:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
>
> (2) the funding recipient had actual knowledge of the sexual harassment, and
>
> (3) the funding recipient was deliberately indifferent to the harassment.

*Id.* "While physical deprivation of access to school resources is not required, *Davis* emphasized that the victims must be 'effectively denied equal access to an institution's resources and opportunities' in order to bring a Title IX damages claim." *Id.* (*quoting Davis*, 526 U.S. at 651). "It follows that a plaintiff bringing a Title IX suit as an individual and not as a member of a class cannot meet the *Davis* requirements unless she can show how the accused school deprived [her] of access to the educational opportunities or benefits provided by the school." *Id.* (internal quotation marks omitted).

Additionally, 20 years ago the Supreme Court stated that "whether gender-oriented conduct rises to the level of actionable harassment … depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651. "Courts

… must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id*.

As recited in the Background section above, the alleged discrimination and sexual harassment against Bethany was done by students. (*See, e.g.,* Doc. 14 at PAGEID # 265, 267 (Bethany "was subjected to severe and pervasive … discrimination by numerous and yet to be identified students"; "Bethany and Witness No. 1 were again subjected to … discrimination by Minors No. 1-5 including threats that they would tie the girls up and rape them. Such threats and harassment were specifically premised upon Bethany and Witness No. 1's gender and constituted sexual harassment as defined by state and federal law.").) While relevant, an allegation that students, instead of teachers or administrators for example, is not determinative of the claim. *See Davis*, 526 U.S. at 653 ("Peer harassment, in particular, is less likely to satisfy [the requirements for a Title IX action] than is teacher-student harassment").

Simply because a boy harasses a girl (or vice-versa) does not automatically deem the harassment "sexual harassment," as Plaintiffs appear to argue. (Doc. 25 at PAGEID # 401.) Also, although, as Plaintiffs point out, the Supreme Court and Sixth Circuit have recognized that a viable claim can theoretically be premised from a single incident (*Davis*, 526 U.S. at 652-53; *Vance*, 231 F.3d at 259), this is not a case where an alleged single incident rises to such a level.[11] Plaintiffs have not shown otherwise.

While this Court certainly does not want to downplay the vile threat that male students

---

[11] *Davis* certainly did not involve a single incident, and the Supreme Court in that case explained problems with a claim based on a single instance: "the provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Davis*, 526 U.S. at 652-53.

allegedly made toward Bethany and her friend that they "would tie the girls up and rape them," or any alleged sexual harassment that she endured, the factual content alleged in the Complaint, while unacceptable, "does not rise to the level of sexual harassment that is so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Miami Univ.*, 882 F.3d at 591 (affirming dismissal of Title IX claim). The Complaint fails to allege a plausible claim for relief according to its requisite elements. *Miami Univ.*, 882 F.3d at 591 ("we have required a plaintiff alleging deliberate indifference to establish an extensive pattern of sexually offensive behavior"); *Pahssen*, 668 F.3d at 360, 363 (holding that three separate occasions of alleged sexual harassment—a male student shoving a female student into a locker, demanding that she perform oral sex on him, and making obscene sexual gestures at her—did not constitute sexual harassment that rose to the level of "severe, pervasive, and objectively offensive").[12]

### (3) Count 3 – *Monell* claim

Plaintiffs also assert a municipal liability claim under Section 1983 based on the alleged violation of Bethany's right of substantive due process and the alleged violation of Title IX, i.e., a *Monell* claim. (Doc. 14 at PAGEID # 280-83; Doc. 25 at PAGEID # 398-400.) As an initial matter, finding that a natural person is safeguarded from a claim by virtue of qualified immunity does not automatically excuse the public entity that natural person represents from constitutional liability. *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000). In other words, it is possible

---

[12] Plaintiffs point to *Vance* and *Davis* to support their argument, but, among other things, the alleged actions of sexual harassment in those cases were significantly more severe and pervasive, particularly with respect to physical, sexual contact. *See Vance*, 231 F.3d at 256-257 (in addition to persistent verbal sexual harassment and propositioning, plaintiff was subjected to numerous incidents of physical sexual contact, including having her breasts and rear grabbed, having her bra snapped, being held while students started yanking her shirt off, and allegedly being "propositioned or touched inappropriately in virtually every class"); *Davis*, 526 U.S. at 633-36 (male student fondled female student's breasts, spoke in vulgar language to her, engaged in sexually suggestive behavior toward her, told her "I want to get into bed with you" and "I want to feel your boobs," placed a door stop in his pants and acted in a suggestive manner toward her, and pled guilty to sexual battery).

that a municipality's agents (here, the individual defendants) may be entitled to qualified immunity

for certain actions while the municipality itself (here, the Board) could perceivably still be held

liable for the same actions.  As the Sixth Circuit explained in *Scott*:

> [T]he doctrine of qualified immunity safeguards only certain natural person
> defendants in their individual capacities.  By contrast, if the legal requirements of
> municipal or county civil rights liability are satisfied, qualified immunity will not
> automatically excuse a municipality or county from constitutional liability, even
> where the municipal or county actors were personally absolved by qualified
> immunity, if those agents in fact invaded the plaintiff's constitutional rights.

*Id*.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "the Supreme Court concluded that

a municipality cannot be held liable <u>solely</u> because it employs a tortfeasor – or, in other words, a

municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *McQueen*, 433

F.3d at 471 (emphasis in original) (internal quotation marks removed).  A municipality is

responsible only for its own illegal acts; a municipality is not vicariously liable under Section 1983

for its employees' actions.  *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014).

Given these limitations, a municipal liability claim must adequately plead two elements:

(1) that a constitutional violation occurred; and (2) that the municipality is responsible for that

violation.  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  With respect to the

second element, "a municipality is liable under § 1983 only if the challenged conduct occurs

pursuant to a municipality's 'official policy,' such that the municipality's promulgation or

adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's

constitutional rights."  *D'Ambrosio*, 747 F.3d at 386 (*quoting Monell*, 436 U.S. at 692).  The

Supreme Court has explained that the "official policy must be the moving force of the

constitutional violation in order to establish the liability of a government body under § 1983."

*Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981).  "Official municipal policy includes the decisions

25

of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *D'Ambrosio*, 747 F.3d at 386-87. The Sixth Circuit has identified four methods a plaintiff may use to allege municipal liability: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." *D'Ambrosio*, 747 F.3d at 387 (internal quotation marks omitted).

Here, with respect to the *Monell* claim, the Complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Regarding the claim as based on violation of Title IX, the first element is not met because, as shown above, the Court finds that a constitutional violation has not been adequately plead.

Regarding the claim as based on violation of Section 1983, Plaintiffs argue three theories for municipal liability. The first is that the Board "had a custom of inaction related to bullying and aggression." (Doc. 25 at PAGEID # 399.) The second is a "fail[ure] to adequately train and supervise" theory. (*Id.* at PAGEID # 399-400.) However, as explained above, Bethany's substantive due process right to life is not violated by inaction (failure to act). *Stiles*, 819 F.3d at 854-55. Therefore, municipal liability cannot follow.[13] *Doe*, 103 F.3d at 505-06 (a constitutional

---

[13] Additionally, municipal liability claims under an inaction theory require allegations of "(1) a clear and persistent pattern of unconstitutional conduct by municipal employees; (2) the municipality's notice or constructive notice of the unconstitutional conduct; (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the policy of inaction was the moving force of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee." *D'Ambrosio*, 747 F.3d at 387-88. Municipal liability claims under a failure to train or supervise theory require that a plaintiff sufficiently allege that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). However, the Complaint does not contain sufficient factual matter to support such allegations with respect to the alleged false assurances—which are the only potential substantive due process violations (as shown above). *Iqbal*, 556 U.S. at 678; *Mohat v. Mentor Exempted Vill. Sch. Dist. Bd. Of Educ.*, No. 1:09 CV 688, 2011 U.S. Dist. LEXIS 58319, at *20-23 (N.D. Ohio June 1, 2011). Moreover, the Complaint alleges false assurances that the bullying of

violation is a necessary element of a municipal liability claim); *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 698 (6th Cir. 2018); *see also McQueen*, 433 F.3d at 471 (where "a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm"). Regarding Plaintiffs' third theory (ratification), Plaintiffs argue that the Board "ratified the unconstitutional acts of the individual Defendants," but fails to explain or show how—particularly with respect to the false assurance allegations. (Doc. 25 at PAGEID # 399.) Again, the thrust of the Complaint, as well as the *Monell* claim, is that Defendants allegedly "failed to" take appropriate action. The factual allegations in the Complaint, even if taken as true and viewed in the light most favorable to Plaintiffs, are not sufficient to state a plausible *Monell* claim. *Polk Cnty.*, 454 U.S. at 326; *Iqbal*, 556 U.S. at 678.

In conclusion, although the terrible circumstances of a child committing suicide is unquestionably wrenching to the hearts of Bethany's family, for the Triad community, and for the Court, the Complaint does not present violation of federal law. *Jones*, 438 F.3d at 698 ("[a]s is so often true in 'state created danger' cases, there is much to lament about what happened here"). Counts 1, 2, and 3 of the Complaint are dismissed.

## C. State Claims and Relief Claims (Counts 5, 6, 7, 8, 9, 11, 12, 13, 14 and 15)

Given that the Court has dismissed all of the federal claims in the Complaint, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and claims that seek a type of relief. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to

---

Bethany was being "handled," that Bethany would be kept safe, and that Caudill told Witness No. 2 that he would contact Bethany's mother right away after being told by Witness No. 2 that Bethany was threatening to kill herself. But the Complaint demonstrates that—assuming the false assurances can constitute a substantive due process violation under the state-created danger exception—making such false assurances were <u>contrary to</u>, not "pursuant to," the municipality's written policies. *D'Ambrosio*, 747 F.3d at 386. (*See, e.g.,* Doc. 14 at PAGEID # 270.)

exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction"); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) (although dismissal is not mandatory because supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right, "[g]enerally, if the federal claims are dismissed before trial, the state claims should be dismissed as well") (internal quotation marks omitted). Specifically, the remaining state law claims are: Count 5 (Negligence / Gross Negligence); Count 6 (Wrongful Death); Count 7 (Survival); Count 8 (Breach of Duty of Care and Supervision); Count 9 (Intentional Infliction of Emotional Distress); Count 11 (Violation of R.C. § 2151.421 Failure to Report Child Abuse); Count 12 (Assault and Battery) (against the Jane/John Doe defendants only); and, Count 13 (Loss of Consortium). The remaining relief claims are: Count 14 (Request for Declaratory Judgment); and, Count 15 (Request for Injunctive Relief).

Therefore, the Court dismisses those claims without prejudice to refiling them in state court. *Booker v. City of Beachwood*, 451 F. App'x 521, 522-23 (6th Cir. 2011) ("Once [a] district court dismisse[s] all of the claims over which it ha[s] original jurisdiction, it act[s] squarely within its discretion by declining supplemental jurisdiction over the remaining [state law] claim[s] and dismissing [them] without prejudice").[14]

## IV.   CONCLUSION

"The facts of this case are undeniably tragic." *McQueen*, 433 F.3d at 462 (*quoting DeShaney*, 489 U.S. at 191). However, the Amended Complaint does not state a facially plausible claim under federal law. For the reasons stated above, the Court **GRANTS IN PART** Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 17) and declines to exercise supplemental

---

[14] Given the outcome, the Court does not rule on Defendants' argument that all claims against Defendant Piper should be dismissed. (Doc. 17 at PAGEID # 310-311.) This is not meant to be a commentary on whether the argument is valid or not; instead, the Court simply declines to rule on the issue because it is not necessary to do so.

jurisdiction over the remaining claims. The Court declines to comment on whether Plaintiffs' remaining claims may or may not be viable if refiled in state court. In accordance with the above analysis, the Court rules as follows:

1. Counts IV and X of the Amended Complaint are **DISMISSED**;

2. Any claim by Plaintiffs on their own behalf for violation of Title IX in Count II of the Amended Complaint is **DISMISSED**;

3. Counts V, VI, VII, VIII, IX, and XIII of the Amended Complaint <u>against the Board (only)</u> are **DISMISSED**;

4. Counts I, II, and III of the Amended Complaint are **DISMISSED**; and

5. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims, so therefore Counts V, VI, VII, VIII, IX, XI, XII, XIII, XIV, and XV are **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

This case shall be **TERMINATED** on the Court's docket.

      **DONE** and **ORDERED** in Dayton, Ohio, this Monday, December 2, 2019.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE